THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* GRENDYS BUILDING CORPORA-
TION *et al.,* Defendants-Appellants.

(No. 54846;

First District—March 20, 1972.

Berger, Newmark & Fenchel, of Chicago, (Harry D. Lavery, of counsel,) for appellants.

Richard L. Curry, Corporation Counsel, of Chicago, (Marvin E. Aspen and John Elson, Assistants Corporation Counsel, of counsel,) for appellee.

Mr. JUSTICE LYONS delivered the opinion of the court:

The City of Chicago brought suit in the Circuit Court of Cook County against defendants to compel them to make certain alterations in a building so that the building would comply with Articles 9.10—1(1) and 9.11—1(1), ch. 194A, of the Municipal Code of Chicago (Chicago Zoning Ordinance).* Following a bench trial, defendants were ordered to cease doing business until they demonstrated compliance with Article 9.11-1(1) by providing 23 off-street parking spaces within three

_____

* Article 9.10—1, entitled "Off-Street Loading—C1-1 to C1-5 Restricted Commercial Districts," provides in part:

"(1) * * * For buildings containing 5,000 to 40,000 square feet of floor area, one loading berth shall be provided * * * Each such loading berth for buildings in excess of 10,000 square feet of floor area shall be not less than 10 feet in width by 50 feet in length.

Article 9.11—1, entitled "Off-Street Parking—C1-1, C1-2, C2-1, C2-2, C3-2 and C-4 Districts," provides in part:

(1) * * * One parking space shall be provided for each four employees."

blocks of the subject premises. In addition, defendants were ordered to construct a 10 by 50 foot loading berth, as required by Article 9.10—1(1), within ninety days of the entry of the order. It is from these orders that defendants have appealed.

The building and premises about which this case centers are located at 2520 West Irving Park Road, Chicago, and consist essentially of a two story building owned by Grendys Building Corporation and leased to Ogden Manufacturing Company, a manufacturer of electrical heating elements. The building was formerly a single story structure with horizontal dimensions of 75 by 125 feet and it has been used by defendants since prior to 1960. The second floor addition, which is used primarily for storage, was added in 1968 at a cost of $80,579.00. Because events surrounding the construction of the second floor addition are closely related to the instant controversy, a detailed examination of those events is necessary.

On or about December 20, 1967, defendants submitted an application for a building permit to the Department of Buildings, City of Chicago. The application and accompanying plans were processed through various sub-departments of the Department of Buildings and approved by each in turn. The proposed project was also examined and approved by an official of the Zoning Office and a rubber stamp bearing the name of John Maloney, Zoning Administrator, was imprinted on the application to indicate that the plans "CONFORMS TO ZONING ORDI- NANCE." Neither the application nor plans designated specific space allocations or dimensions for a loading berth or off-street parking. On March 12, 1968, the City issued a building permit and defendants com- menced construction of the second story addition shortly thereafter. The City issued an Occupancy Certificate on April 22, 1968, over the signa- ture of John Maloney, Zoning Administrator. That certificate, which is issued only after an inspector personally investigates the property and reports that it is in full compliance with the Chicago Zoning Ordinance, recites in part: "This is to certify that such building or premises [re- ferring to defendants' building] complies with the provisions of the Chicago Zoning Ordinance and such building or premises may be oc- cupied as Mfg. in C1-1 District."

Construction of the second floor addition progressed until on or about June 19, 1968, when the City issued a "Stop Order" concerning the con- struction. This order, sent by the Commissioner of Buildings to the Superintendent of Police, directed the police to "STOP AND KEEP STOPPED ALL WORK AT THIS LOCATION [2520 W. Irving Park Road] FOR CAUSE. (INSUFFICIENT PARKING)" The order was an apparent response by the City to complaints registered by private citi-

zens who lived near the Ogden Manufacturing Company. These citizens were disgruntled because parking spaces in front of their homes were allegedly being used by employees of Ogden and other manufacturing concerns in the area. They had also complained because large delivery trucks were allegedly using nearby streets and alleys on a regular basis.

After the construction had been halted by the police, Roman Grendys, President of both the Ogden Manufacturing Company and the Grendys Building Corporation, went to the Building Commissioner's office to inquire why the construction had been stopped. According to Grendys, "He [city official] told me, 'Now, we find out, you don't have adequate parking.' I said, 'I didn't think I needed adequate parking for a storage factor.' He said, 'You have got to have it.' I said, 'I have facilities for it, and this can be arranged,' so after a couple of weeks, they started to begin, and everything was all right." Grendys also submitted the following affidavit at the apparent request of the city official:

### AFFIDAVIT

"I, ROMAN M. GRENDYS, Affiant, President of OGDEN MANU-FACTURING COMPANY, an Illinois corporation, located at 2520 West Irving Park Road, Chicago, Illinois make this Affidavit for the purpose of inducing the Department of Buildings of the City of Chicago to permit continuing construction of a second story on the premises located at the aforementioned address.

\* \* \*

AFFIANT FURTHER SAYS that a permit for the second story now under construction was issued March 12, 1968, No. 398485 and occupancy certificate was issued April 22, 1968, No. 127628.

AFFIANT FURTHER SAYS that the same number of people will be employed as is set forth in the permit and that four (4) spaces for parking will be available in the present garage located on the corner of Maplewood and the alley at the rear of the premises.

AFFIANT FURTHER SAYS, that additional space for parking two (2) cars will be provided in the same building as a result of moving the shipping room to another room which will give OGDEN MANU-FACTURING COMPANY a total of six (6) spaces for parking in the present building.

AFFIANT FURTHER SAYS that over forty (40) of the employees live in the area and have access to Affiant's place of business from the immediate surrounding blocks.

AFFIANT FURTHER SAYS that the second floor which is presently under construction will be used for that which is termed "dead storage" in terms of inventory.

AFFIANT FURTHER SAYS that the place of business has never created a nuisance in terms of parking, noise or otherwise and fails to understand the complaint presently before the Department of Buildings.

AFFIANT PRAYS that it be permitted to proceed with construction in light of the permit issued and the large sums of money already invested in the aforementioned construction."

/s/ Roman M. Grendys

[NOTARIZED JULY 2, 1968]

Following Grendys' conversation at the Building Department and his execution of the affidavit, the Building Commissioner directed the Superintendent of Police on July 3, 1968, to "ALLOW WORK TO PROCEED AS PER AFFIDAVIT FILED WITH DEPT. OF BUILDINGS."

Construction of the second floor addition was resumed and it continued without interruption until completed in early November 1968. On November 8, 1968, a letter was sent by the City over the signature of John Maloney, Zoning Administrator, to the Ogden Manufacturing Company. The letter stated:

\* \* \*

"You are hereby notified as owner, agent, lessee or occupant of premises known as 2520 West Irving Park Road to comply with the following requirements of the MUNICIPAL CODE OF CHICAGO within AT ONCE [sic].

Provide adequate parking spaces as provided for in the Chicago Zoning Ordinance. Art. 9.11-1(1) (one space for every four employees).

Provides a loading berth of not less than 10 feet wide by fifty 50 in length [sic] as provided for by the Chicago Zoning Ordinance. Art. 9.10-1(1)."

On November 21, 1968, a letter was sent to Ogden by the Department of Buildings over the signature of the Chief Code Enforcement Officer. This letter stated:

\* \* \*

"You are hereby notified that permit #B 398485, issued on 3-12-68 for above premises is hereby revoked because For Cause [sic].

Will you kindly return, without delay, said permit to this office for cancellation."

Subsequently, on November 26, 1968, the City brought suit against defendants. Following a bench trial and various post-trial proceedings, the court entered the orders from which defendants have now appealed.

■■ Defendants have challenged the lower court judgment on sev-

eral grounds. With respect to the alleged violation of Art. 9.10-1(1) of the Chicago Zoning Ordinance, which concerns loading berth requirements, defendants argue that the City should have been estopped from enforcing the ordinance. We agree. As stated in *Gregory v. City of Wheaton*, 1961, 23 Ill.2d 402, 407—8:

> "It has long been established that the doctrine of equitable estoppel is applicable to municipal corporations. In *People ex rel. Beardsley v. City of Rock Island*, 215 Ill. 488, the rule was expressed as follows: 'Where a party acting in good faith under affirmative acts of a city has made such expensive and permanent improvements that it would be highly inequitable and unjust to destroy the rights acquired, the doctrine of equitable estoppel will be applied.' But before the doctrine can be invoked there must have been some positive acts by the municipal officers which may have induced the action of the adverse party. Mere inaction is not enough. (Citations.) In the case at bar the only positive act relied upon is the issuance of a building permit, and all this did was allow the construction of a stairway at a cost of $400. Moreover, it must appear that the party relying on the doctrine incurred a substantial change of position or made extensive expenditures."

In the instant case, it appears from the record that defendants relied in good faith upon the City's affirmative acts and expended over $80,000 for improvements to their building. To now deny them the use of their premises or otherwise require them to made additional costly improvements to the structure would be grossly inequitable under the special facts and circumstances of the case.

Here the City of Chicago approved construction plans which *did not* provide for a loading berth of required dimensions and issued a building permit to defendants. It is true, as the City argues, that these actions by the City were alone insufficient to create an estoppel situation, *Cities Service Oil Co. v. City of Des Plaines* 1961, 21 Ill.2d 157; *Sinclair Refining Co. v. City of Chicago* 1927, 246 Ill.App. 152, but other factors must also be considered. First, the permit was issued in early March 1968 and the City did not seek to revoke it or otherwise give defendants notice of the alleged loading berth violation until November 1968, some eight months later. Second, a Certificate of Occupancy was issued in April 1968 after a personal investigation by a city inspector. Third, the City issued a "Stop Order" in June 1968 because of an alleged parking space violation—not because of a loading berth violation. Next, the City conferred with Roman Grendys, authorized representative for defendants, and caused him to execute an affidavit. At no time during

these discussions did the City make any reference to loading berth violations or requirements; nor did the City require the affidavit to include any such references. Next the City retracted its "Stop Order" and authorized the construction to continue according to plan and, indeed, allowed it to be completed. It was not until the work had been completed that the City attempted, for the first time, to enforce the loading berth provisions of the zoning ordinance.

■■ Under these circumstances, we think defendants were entitled to rely upon the building permit and apparent acquiescence of the City insofar as the failure to provide for a loading berth was concerned. Moreover, even if it were conceded that the building permit was issued through mistake, the lapse of eight months without any attempt to enforce the loading berth provisions constituted conduct on the part of the City from which it could reasonably be inferred that the issuance was, in effect, ratified. *Cities Service Oil Co. v. Des Plaines* (1961), 21 Ill.2d 157; *City of El Paso v. Hoagland* (1906), 224 Ill. 263.

■■ The City's argument that construction of the second floor addition was totally unrelated to the loading berth violation is not convincing. It is clear that defendants became subject to the specified provisions of the zoning ordinance only as a direct result of constructing the second floor addition. Indeed, prior to the construction, defendants' building contained only 9,375 square feet. Under the ordinance, defendants were not obligated to provide a loading berth measuring 10 by 50 feet unless the building's square footage exceeded 10,000 square feet. It was the addition of the second floor, measuring 40 by 125 feet, which brought the square footage of the building over the 10,000 square feet minimum specified in the ordinance. We conclude, therefore, that the facts and circumstances of this case are sufficient to raise an estoppel against the City insofar as enforcement of Article 9.10-1(1) of the Chicago Zoning Ordinance is concerned.

■■ We now turn to a consideration of that portion of the lower court order which directed defendants to cease doing business until they provided twenty-three off-street parking spaces. Here we may not apply the doctrine of equitable estoppel to the extent we found necessary when dealing with the City's attempt to enforce the loading berth provisions of the zoning ordinance because the City did not wait until construction was complete before notifying defendants of the parking space violation. Rather, in June 1968, long before construction was complete, the City issued a "Stop Order" precisely because defendants were in violation of the one-to-four parking space provisions of Article 9.11-1(1). Subsequently, city officials conferred with Roman Grendys and advised him that defendants were in violation of the parking ordinance. Grendys

then submitted an affidavit wherein he agreed to provide a total of six off-street parking spaces. Although the Ogden Manufacturing Company employed 86 personnel at the time, and under the ordinance 22 off-street parking spaces should have been required, the City obviously elected to accept Grendys' agreement to provide only six spaces, because it withdrew the "Stop Order" and allowed the work to resume and, indeed, be completed. Under such circumstances, we believe that defendants were entitled to rely upon the City's complete acquiescence insofar as the number of parking spaces for the 86 employees was concerned. Having agreed that six spaces would satisfy zoning requirements in June, the City was in no tenable position to contend otherwise in November. We believe the City was equitably estopped from requiring more than six spaces for the 86 personnel employed by defendants in June.

■■ The City argues, however, that it was misled concerning the number of personnel actually within defendants' employ both when it issued the building permit and when it retracted its "Stop Order." We find no persuasive evidence in the record to support the City's position in this regard. City inspectors visited defendants' premises prior to the issuance of the Certificate of Occupancy and again, apparently, prior to the issuance of the "Stop Order." Nowhere does it appear that *any employee* of defendants gave false or erroneous information regarding the total number of personnel employed. It does appear, according to the testimony of one City Official, that the building contractor engaged in constructing the second floor addition *might have* indicated, prior to the issuance of the building permit, that defendants employed 55 persons. However, we are not inclined to believe that the City completely relied upon such sketchy information when admittedly the City sent inspectors to personally check for building and zoning violations.

We conclude, therefore, that the City may strictly enforce the provisions of Article 9.11-1(1) only insofar as defendants' employees exceed 86. Because defendants employed 100 persons at the time of trial, they are thus obligated to maintain a total of ten off-street parking spaces, *i.e.,* six spaces for the first 86 employees and four spaces, on a one-to-four basis, for the number of employees in excess of 86. The record discloses that defendants are presently maintaining more than ten off-street parking spaces. Accordingly, the judgment is reversed and the cause is remanded with directions to enter judgment in favor of defendants.

Judgment reversed and cause remanded with directions.

GOLDBERG, P. J., and BURKE, J., concur.